Robert J. Frank (Col. Bar No. 19765)
Robert J. Frank & Associates, L.L.C.
8 South Nevada Ave. Suite 301B
Colorado Springs, CO 80903
719/ 635-7025 (Telephone)
719/633-2246 (Facsimile)
Rob@rjflaw.com (Email)

Perry Sanders (LA Bar No. 01577)
Sandra L. Ribera (Cal. Bar No. 236769)
Sanders Law Firm, LLC
8 South Nevada Ave., Suite 301B
Colorado Springs, CO 80903
719/ 227-1168 (Telephone)
719/633-2246 (Facsimile)
Perry@scclaw.net (Email)
sandraribera@comcast.net (Email)

Bradley Gage (Cal. Bar No. 117808)
Law Offices of Goldberg & Gage
23002 Victory Blvd.
Woodland Hills, CA 91362
818/340-9252 (Telephone)
818/340-9088 (Facsimile)
bgage@goldbergandgage.com (Email)

Christopher Brizzolara
 (Cal. Bar. No.130304)
1528 16th Street
Santa Monica, California 90404
310/394-6447 (Telephone)
310/656-7701 (facsimile)
samorai@surfcity.net

ATTORNEYS FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER JORDAN WALLACE, by and through his mother and Guardian ad Litem, FAITH EVANS; T'YANNA DREAM WALLACE, by and through her mother and Guardian ad Litem, FLORENCE JACKSON<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, a municipal corporation; RAFAEL PEREZ aka RAY LOPEZ; NINO DURDEN; AND DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: CV 07-02956 FMC (RZx)<br><br>*Assigned to Hon. Florence Marie Cooper*<br><br>[Related Action:<br>Case No. 2:02-cv-02929 FMC (RZx)<br><br>**Action Filed April 16, 2007**<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. Deprivation of Familial Companionship and Society in violation of Fourteenth Amendment, 42 U.S.C. §1983;<br>2. Conspiracy in violation of 42 U.S.C §1983, 42 U.S.C. §1985;<br>3.  Deliberate Indifference in violation of the Fourteenth Amendment, 42 U.S.C. § 1983; |

COME NOW the Plaintiffs, and for cause to complain against the Defendants, state and allege as follows:

## I. JURISDICTION AND VENUE

1.      Plaintiffs allege and complain against the Defendants, and each and every one of them as follows:

      A.      City of Los Angeles, a municipal corporation;

      B.      Rafael Perez a.k.a Ray Lopez, (referred to at material times as Perez) individually for conduct occurring under color of his authority as a LAPD Officer;

      C.      Nino Durden (referred to at material times as Durden) individually for conduct occurring under color of his authority as a LAPD Officer;

      D.      Certain unknown persons identified as DOES 1 through 25 whose actions have been consciously concealed by the aforementioned Defendants.

2.      Competent subject matter jurisdiction and venue exist, in whole or in part, pursuant to the following federal statutes:

      A.      42 U.S.C. §1983;

      B.      42 U.S.C. §1985(2);

      C.      42 U.S.C.  §1985(3);

      D.      Federal Civil Rights Jurisdiction:  28 U.S.C. §§1343(1) - (5);

      E.      Federal Question Jurisdiction:  28 U.S.C. §1331;

      F.      Federal General Venue:  28 U.S.C. §1391(b).

3.      The Plaintiffs allege compliance with California Government Code §§ 900, *et seq.*, is preempted by invocation of Federal Question Jurisdiction 28 U.S.C. §1331, and application of *Williams v. Horvath*, 16 Cal. 3rd 834, 129 Cal. Rpt. 453 (1976), and *County of Los Angeles v. Superior Court*, 92 Cal. Rep 2nd 668, 78 Cal.

App. 4th 212 (2000). Plaintiffs have alleged claims for relief arising under the Fourteenth Amendment to the Constitution and laws of the United States of America.

4.  The Plaintiffs are citizens of the United States.

A.  The Plaintiff, Christopher Jordan Wallace, at all times mentioned herein, was a minor child residing in Los Angeles, California. The Plaintiff, Christopher Jordan Wallace, is the child of the decedent, Christopher G. L. Wallace, as defined by Section 377.60 of the California Code of Civil Procedure. The Plaintiff, Christopher Jordan Wallace, sues as an individual in his own right through his mother and Guardian ad Litem, Faith Evans, and as a successor in interest, heir, and legal representative of the decedent to seek redress for the deprivation of the decedent's rights;

B.  The Plaintiff, T'Yanna Dream Wallace, at all times mentioned herein, was a minor child residing in Straudsburg, Pennsylvania. The Plaintiff, T'Yanna Dream Wallace, is the child of the decedent, Christopher G. L. Wallace, as defined by Section 377.60 of the California Code of Civil Procedure. The Plaintiff, T'Yanna Dream Wallace, sues as an individual in her own right through her mother and Guardian ad Litem, Florence Jackson, and as a successor in interest, heir, and legal representative to seek redress for the deprivation of the decedent's rights.

5.  Plaintiffs allege that at all times material hereto, the City of Los Angeles was a municipal corporation organized and existing under the Constitution of the State of California and operating and subject to the laws and statutes as codified within the California Code, maintaining its principle place of business at the Office of the Mayor, City Hall, City of Los Angeles. Plaintiffs further allege that the City of Los Angeles, pursuant to statutes and laws promulgated by the State of California,

FIRST AMENDED COMPLAINT

provides law enforcement to protect and serve persons within the City of Los Angeles.

6.      Plaintiffs allege that at all times material hereto, the Los Angeles Police Department [LAPD] was a governmental agency created and existing under the Constitution of the State of California and operating and subject to the laws and statutes as codified within the California Code annotated, maintaining its principle place of business at the Office of the Chief of Police, City of Los Angeles.

7.      Plaintiffs allege that at all times material hereto, David Mack was a Los Angeles Police Department officer and engaged in the conduct alleged herein under color of State Law, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

8.      Mack was formerly a Defendant herein.   Plaintiffs' actions against Mack herein were dismissed in 2005.

9.      Plaintiffs allege that the conduct and actions of former defendant Mack as alleged herein occurred under the pretense that he was acting as a Los Angeles Police Officer or were made possible solely because of his position as a Los Angeles Police Officer.

10.     Plaintiffs allege that Mack acted at all times herein jointly with Perez who was on duty at the times of the allegations made herein and was acting under color of State Law and/or within the course and scope of his authority with the Los Angeles Police Department, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

11.     Plaintiffs allege that Mack acted at all times herein jointly with Durden who was on duty at the times of the allegations made herein and was acting under color of State Law and/or within the course and scope of his authority with the Los Angeles Police Department, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

FIRSTAMENDED COMPLAINT

12.    Plaintiffs allege that at all times material hereto, Perez was a Los Angeles Police Department officer and engaged in the conduct alleged herein under color of State Law and/or within the course and scope of his authority with the Los Angeles Police Department, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

13.    Plaintiffs allege that the conduct and actions of Defendant Perez as alleged herein occurred under the pretense that he was acting as a Los Angeles Police Officer or were made possible solely because of his position as a Los Angeles Police Officer.

14.    Plaintiffs allege Perez was on duty and in uniform at the times of the allegations made herein, including, but not limited to the night of March 9, 2007.

15.    Plaintiffs allege that Perez acted at all times herein jointly with Mack who was, at the times of the allegations made herein, acting under color of State Law, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

16.    Plaintiffs allege that Perez acted at all times herein jointly with Durden who was on duty at the times of the allegations made herein and was acting under color of State Law and/or within the course and scope of his authority with the Los Angeles Police Department, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

17.    Plaintiffs further allege that Perez acted at all times herein jointly with others unnamed, who at all times pertinent hereto, were willful participants with Defendants Mack, Perez and Durden in activities which deprived others, including the Plaintiffs, of their constitutional rights.

18.    Plaintiffs allege that at all times material hereto, Durden was a Los Angeles Police Department officer and engaged in the conduct alleged herein under color of State Law and/or within the course and scope of his authority with the Los

FIRSTAMENDED COMPLAINT

Angeles Police Department, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

19. Plaintiffs allege that the conduct and actions of Defendant Durden as alleged herein occurred under the pretense that he was acting as a Los Angeles Police Officer or were made possible solely because of his position as a Los Angeles Police Officer.

20. Plaintiffs allege Durden was on duty and in uniform at the times of the allegations made herein, including, but not limited to the night of March 9, 2007.

21. Plaintiffs allege that Durden acted at all times herein jointly with Mack who was, at the times of the allegations made herein, acting under color of State Law, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

22. Plaintiffs allege that Durden acted at all times herein jointly with Perez who was on duty at the times of the allegations made herein and was acting under color of State Law and/or within the course and scope of his authority with the Los Angeles Police Department, and through the auspices of the City of Los Angeles and the Los Angeles Police Department.

23. Plaintiffs allege that venue is proper within this jurisdictional district pursuant to Title 28 U.S.C. §1391(b) in as much as all Defendants transact business and/or can be found within this district and that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## II. FACTUAL ALLEGATIONS

24. Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

25. Christopher G. L. Wallace was shot at approximately 12:49 a.m. on March 9, 1997 within the City and County of Los Angeles.

FIRSTAMENDED COMPLAINT

26.   On the evening of the homicide, Christopher G. L. Wallace and numerous witnesses to his murder were attending a party at the Petersen Automotive Museum.

27.   At approximately 12:04 a.m. the Los Angeles City Fire Department called the Los Angeles Police Department requesting assistance with a large crowd that had gathered in the parking structure near the Museum.  Numerous Los Angeles Police Department officers responded to assist with the crowd.

28.   At approximately 12:36 a.m. there was a report of shots fired in the vicinity of the Petersen Automotive Museum.  Again, police responded.

29.   Sometime before 12:42 a caravan of three vehicles carrying Christopher G. L. Wallace and his group left the Petersen Automotive Museum.

30.   Numerous uniformed and undercover Los Angeles Police Department officers were present in the area of the Petersen Automotive Museum.

31.   The Los Angeles Police Department and its officers had specific knowledge Christopher G.L. Wallace would be, and was, present at the party at the Petersen Automotive Museum.

32.   As the vehicle in which Christopher G. L. Wallace was riding stopped at a traffic control signal, vehicle pulled along side.  Several gunshots were fired from the vehicle hitting and killing Christopher G. L. Wallace.

33.   This shooting occurred just moments after shots were reported fired on the other side of the Petersen Automotive Museum.

34.   Despite the significant police presence, on duty police officers asserted they did not observe the shooter and the shooter was not apprehended.

35.   Prior to the murder of Christopher G. L. Wallace, the Los Angeles Police Department knew or reasonably should have known:

    A.   there was an atmosphere of violence and alleged criminality surrounding an organization called Death Row Records and certain street

FIRSTAMENDED COMPLAINT

gangs, including the Bloods gang, associated with Death Row Records and its agents, employees and/or representatives;

B.      officers of the Los Angeles Police Department were also working along side of suspected and convicted criminals for Death Row records and/or were members of, socializing with or affiliated with members of street gangs, including the Bloods gang;

C.      Los Angeles Police Officers were chosen to work and socialize with Death Row Records and certain affiliated street gangs because the color of their authority as police officers allowed them access to internal police information, internal police communications, police radios, badges, firearms, and other law enforcement equipment that members of the public could not lawfully possess;

D.      certain persons intimately associated with Death Row Records and the Bloods street gang had consistently exhibited significant animosity toward Christopher G. L. Wallace and his record label and blamed Christopher G. L. Wallace and his record label  for the death of Tupac Shakur, a popular Death Row Recording Artist killed in September 1996, in Las Vegas, Nevada;  and

E.      that given the atmosphere of violence and criminality there was a foreseeable risk to Christopher G. L. Wallace posed by persons aligned with Death Row Records and the Bloods gang, including members of the Los Angeles Police Department.

36.      Among the facts known to the Los Angeles Police Department regarding Mack, Perez, Durden and associated individuals, including associates of Death Row Records, at the time of the murder of Christopher G. L. Wallace included without limitation the following:

FIRSTAMENDED COMPLAINT

A.    Knight was a member or associate of the Bloods Street Gang and was sole or part owner, officer, director, managing agent, employee, shareholder and/or manager of Death Row Records.

B.    Reggie Wright Jr. was the sole or part owner, officer, director, managing agent, employee, shareholder, and/or manager of Wright Way Protective Services.   Wright Way Protective Services provided security and protective services to Death Row Records, its employees and recording artists.

C.    Members of the MOB Piru Bloods Street Gang associated with Death Row Records, and were employed by Death Row Records and/or Wright Way Protective Services.

D.    Death Row, associates of Death Row, and the Bloods street gang, and Marion Knight, were suspected by the LAPD of having conspired to commit, and or commit, numerous crimes.

E.    On or about February 9, 1991, Mack, while working off duty security pursuant to a work permit issued by the LAPD, improperly identified himself as a police officer and utilized excessive force against a civilian in Inglewood, California.  On or about June 26, 1991, Mack was suspended by the LAPD for this misconduct.

F.    On or about May 28, 1991, Mack, while on duty as an LAPD officer, was alleged to have stolen the driver's license of a motorist stopped by Mack.  Mack was described by the LAPD at that time as an aggressive officer with a "John Wayne Syndrome".  Mack was counseled by the LAPD regarding his accumulating allegations of inappropriate public contacts.

G.    In September of 1993, Calvin Broadus, a/k/a Snoop Dogg, a Death Row Records recording artist was charged, along with two others associated with Death Row Records, in the murder of a gang member in

Los Angeles.  Forensic and ballistic evidence crucial to the case in the possession of the Los Angeles Police Department became missing from the Los Angeles Police Department Pacific Division.  At the time the evidence became missing, Kevin Gaines, a Los Angeles Police Department officer assigned to the Pacific Division, was living with Sharitha Knight of Death Row Records.  At the time the evidence disappeared, Sharitha Knight was the manager for Calvin Broadus.

H.    In 1993 and 1994, Mack and Perez were assigned as partners in LAPD narcotics enforcement.  While partners and at other times, Mack and Perez stole narcotics from members of gangs, including members of the Crips street gang, and sold narcotics to members of the Bloods and other street gangs.  While partners, Officers Mack and Perez were photographed dressed in red colored clothing associated with the Bloods street gang.

I.    On October 26, 1993, Officer Mack, while partnered with Perez in LAPD narcotics enforcement, shot multiple times and killed an individual.  Prior to the shooting, the individual had identified Mack and Perez as members of a street gang.

J.    On February 7, 1994, while partnered with Mack in LAPD narcotics, Perez reported to the LAPD that his LAPD Badge number 12188 was stolen.  On February 8, 1994, the LAPD issued to Perez LAPD Badge number 12192.  However, Perez's LAPD Badge number 12188 was never stolen, and Perez had the badge in his possession, custody, or control until August 2, 1998, when the LAPD seized the badge from Perez's home.  Perez reported the badge as stolen so as to utilize same in criminal activities.

K.    Prior to March 20, 1994, while partnered with Mack in LAPD narcotics, Perez stole an LAPD ROVER radio.  Perez had the

stolen LAPD ROVER radio in his possession, custody, or control until August 2, 1998, when the LAPD seized the radio from Perez's home.   The ROVER radio was stolen by Perez to utilize same in criminal activities.

L.   From in or around April, 1994 through the time of the murder of Wallace, Perez was assigned to work in the Rampart CRASH and Rampart Narcotics Field Enforcement Sections of the LAPD.   Perez was sponsored in Rampart by LAPD Officer Samuel Martin, a close friend of Mack and the godfather of his children.   While assigned to Rampart, Perez engaged in a pattern of criminal activity, including but not limited to stealing narcotics, trafficking in narcotics, stealing firearms, removing the serial numbers from stolen firearms, shootings and other excessive force, fabricating official police records, framing innocent individuals, and numerous violations of the civil rights of the citizens of Los Angeles.

M.   On November 1, 1994, Tupac Shakur was shot five times during a robbery in the lobby of Quad Recording Studios, in the area of Times Square New York City.   Christopher G. L. Wallace, and persons associated with Christopher G. L. Wallace, were inside the studio during the incident.   Without evidence, Tupac Shakur and persons close to Death Row Records believed Christopher G. L. Wallace had knowledge or involvement in the shooting.

N.   On March 13, 1995 a gang member was murdered at a Death Row Records event at the El Rey Theatre.   The police report states "Many of the security people at the party were off duty police officers, from Long Beach P.D., Compton P.D., Inglewood P.D., Hawthorne P.D., Los Angeles Police Department, all working for Wright Way Protective Services.   The victim was beaten by numerous Blood gang members while the off duty police officers watched.   When the police arrived the off duty officers left the scene without giving a statement."   Wright Way Protective

Services was owned and operated by Reggie Wright, Jr., an executive of Death Row Records, and provided security and other services for Death Row Records.

O.    At the 1995 Source Awards, Marion "Suge" Knight of Death Row Records, made certain antagonistic remarks towards Sean Combs and Bad Boy Records, the label for which Christopher G. L. Wallace performed.

P.    On November 5, 1995, Officer Richard McCauly of the Los Angeles Police Department was investigated by the Los Angeles Police Department and determined to be for working for Death Row Records.

Q.    On December 18, 1995, following the MTV Awards, an individual named Mark Anthony Bell was reported to have been assaulted by members of Death Row Records seeking information on the whereabouts of Sean Combs.    Mr. Bell reported on the tension and violence between Death Row Records and Bad Boy Records.  Mr. Bell reports hearing radio communication, and was subsequently released. Upon his release, LAPD Officers were present on the scene.  Two off-duty officers were present at the Death Row Party during the reported assault of Mr. Bell.

R.    On March 7, 1996 a fight broke out between Death Row records personnel and Bad Boy Records personnel in the VIP area at the 1996 Soul Train Awards.  Guns were reportedly brandished.

S.    In May 1996, Death Row Records was investigated by the City of Los Angeles and/or the LAPD for zoning violations associated with numerous crimes of violence.  Investigating officers report "There are armed security guards at this location in plain clothes and in security uniforms.  These security officers are off-duty police officers and retired officers which are [sic] employed by "Death Row Records.""

T.    LAPD officers responding to studios used by Death Row Records note: "Snoop-Doggie-Dog was present at the location with 15-20 additional gang members. t[sic]here was also armed security guards present at the location in security uniforms. Also present were off duty black police officers from Hawthorne P.D. and other unk[sic] agencies. I was informed by the manager of the studio and other security officers that were present at the location that a [sic] O[sic]fficer from Metro/ Los Angeles Police Department was also employed at this location. They further stated that they work directly for Snoop-Doggie-Dog as his body guard service."

U.    On June 1, 1996, the LAPD was informed that other law enforcement agencies were conducting an investigation of Death Row Records.

V.    On June 2, 1996, a meeting was held between the LAPD and Death Row Records to discuss dissatisfaction with armed security personnel and the possibility of armed confrontations with Police and security personnel or gang members who frequent the location." Issues of off-duty Police Officers working at the location were also discussed.

W.    In August of 1996, LAPD officers responded to a call at the home of Sharitha Knight, the manager of Death Row Recording artist "Snoop Doggy Dogg", and the former wife of Knight. LAPD officer Kevin Gaines was present and had a confrontation with the responding police officers.

X.    On August 18, 1996, four identified gang members were arrested by LAPD officers as they left studios used by Death Row Records. A semi-automatic handgun and two ski masks were recovered at the time of the arrest.

Y.     On September 7, 1996, Orlando Anderson a.k.a. "Baby Lane," purportedly a recording artist with Bad Boy Records, was assaulted in the MGM Grand Hotel in Las Vegas. Knight, Tupac Shakur, and other Death Row Records personnel allegedly committed the assault in response to the continuing tensions between the two record companies.

Z.     On September 7, 1996, Tupac Shakur of Death Row Records was shot in Las Vegas in the car driven by Knight after he left the MGM Grand Hotel.  Shakur died 6 days later.

AA.   On September 9, 1996 the Los Angeles Police Department reported: "[S]ources close to Death Row Records indicated there was an East coast rivalry and recording power struggle between "Bad Boy Entertainment: from New York headed by Sean "Puffy" Combs, affiliated with Los Angeles Crips connection Mike Conception; against Suge Knight, Tupac Shakur and Death Row Records."

BB.   On September 9, 1996, according to a Compton Police Department Search Warrant Affidavit of the Bloods street gang associated with Death Row Records, gang members met at Leuders Park to discuss retaliation against South Side Crips Gang members for the Tupac Shakur shooting.

CC.   On October 4, 1996, Perez reported to the LAPD that his LAPD Badge number 12192 was stolen in the Rampart station.  The LAPD issued to Perez another LAPD badge.  However, Perez's LAPD Badge number 12192 was never stolen, and Perez had the badge in his possession, custody, or control until August 2, 1998, when the LAPD seized the badge from Perez's home.  Perez reported the badge as stolen so as to utilize same in Perez's criminal activities.

DD.   In October of 1996, Perez and his Rampart partner LAPD Officer Nino Durden shoot and paralyze an unarmed man.

EE.   On November 20, 1996, Mack attended a police officer training class in homicide/death investigation as part of his LAPD training.

FF.   From 1991 - the time of the murder, Perez was the subject of multiple complaints by civilians and LAPD personnel, including complaints for theft, unlawful searches, and unauthorized force. The LAPD failed to properly investigate numerous of these complaints against Perez, and instead improperly adjudicated the complaints as not resolved.

GG.   While employed as an LAPD officer, Perez was photographed wearing red clothing affiliated with the Bloods street gang, and using gang hand signs. While employed as an LAPD officer, Perez's police flashlight had the inscriptions "Born to Kill" and "Thump" on the ends of the flashlight. While employed as an LAPD officer, Perez possessed the keys to numerous police vehicles, both marked and unmarked. While employed as an LAPD officer, Perez and his partner maintained stolen guns from which the serial numbers had been defaced in the trunk of their police vehicle.

HH.   In 1996 to early 1997, LAPD conducted extensive surveillance and investigation of the recording studio used by Death Row Records. An officer observed Mack and Perez at the studios on multiple occasions dressed in gang member style clothing. During this time period Perez is observed by a former LAPD officer at the offices of Death Row Records. During this time period Mack and Perez are observed at multiple functions involving Death Row Records, and at a nightclub in Las Vegas owned by Knight called "662" which corresponds with letters "MOB" on a telephone dial to signify Knight's membership and/or association with the MOB Piru Bloods street gang.

II.   In March, 1997, Mack solicited another LAPD Officer to work security for individuals associated with Death Row.

JJ.   On March 9, 1997, Christopher G. L. Wallace was murdered.

KK.   A day after the murder of Christopher G. L. Wallace, Los Angeles Police Department officers interviewed a confidential informant who implicated Officer Mack.

LL.   On October 10, 1997, Mack attended a police officer training class in burglary/theft investigation as part of his LAPD training.

MM.  On November 6, 1997, Mack committed a bank robbery with at least two black accomplices, neither of whom have ever been arrested.  Mack utilized an LAPD police radio during the robbery.  Mack was arrested and convicted of bank robbery.  During a search of his home the police discovered evidence linking him to the murder of Christopher G. L. Wallace.

NN.   Mack attended a police officer continuing education training program in robbery investigation before the bank robbery, and attended a police officer continuing education training program in homicide investigation before the murder (this information was previously concealed from Plaintiffs.)

OO.   Mack used a Black '95 Impala SS as a third get away car on bank heist.

PP.   A vehicle that was and/or resembled a black '95 Impala SS was used in the shooting of Christopher G. L. Wallace.

QQ.   Police radio traffic was heard coming from suspects in the bank getaway.  The Los Angeles Police Department thought this evidence was sufficiently indicative of police officer involvement that it was used in obtaining a search warrant for Mack's home in the robbery investigation.  Both Mack and Perez were in possession of

FIRST AMENDED COMPLAINT

stolen police radios at the time of the bank robbery.

RR.   Mack told an accomplice he had police radios and knew how everything would work out.

SS.   Mack had access to police communications on both the night of Christopher G. L. Wallace's murder and the date of the bank robbery.  Police communication equipment was found in the search of his home.

TT.   Christopher G. L. Wallace was killed in a very efficient, organized and professional manner suggesting that a high degree of coordination and planning preceded his murder.  There were numerous police officers and witnesses in the vicinity of the murder.  Police had just been called to the front of the building due to shots having been fired in the air.  No on duty LA police officers other than Perez and Durden were in the vicinity of the Murder.  The murderers had access to equipment (police radio) and knowledge of police tactics, which would allow them to strike at precisely the right time.  This follows the pattern demonstrated by Mack during the bank robbery.

UU.   It was well known to the Los Angeles Police Department that Defendant Mack was closely associated with Officers Perez and Gaines.  The Los Angeles Police Department knew that Gaines, Perez and Mack were conducting coordinated efforts involving serious criminal conduct.  Mack had access to numerous items of Police property, including police scanners.  Approximately $700,000.00 is still missing from Mack's bank robbery.

VV.   After the murder of Christopher G. L. Wallace, officers employed by the Los Angels Police Department learned that an informant had stated that a "police officer named Mack" was paid

$25,000.00 to murder the decedent Christopher G.L. Wallace. This statement was consciously concealed by the Defendants stated herein and was not disclosed to the public or to the Plaintiffs.

WW.   Despite having knowledge of the above stated evidence the Los Angeles Police Department consciously concealed David Mack's involvement in the murder of Christopher G. L. Wallace.

37.   Despite possessing knowledge of officer involvement in Death Row Records and its associated street gang, and despite knowledge of the criminality and violence associated therewith, the Los Angeles Police Department failed to take objectively reasonable steps to investigate, discipline, or prosecute those officers involved with Death Row Records or an affiliated street gang and consciously concealed evidence of officer involvement in criminal enterprises from the public.

38.   Despite knowing that Christopher G. L. Wallace would be present at the party at the Petersen Automotive Museum, and that persons affiliated with Death Row Records and an affiliated street gang including, and in particular, Officer David Mack, Officer Rafael Perez, Officer Nino Durden, and other police officers associated with Death Row, posed a risk of danger to persons affiliated with Bad Boy Records and Christopher G. L. Wallace in particular, the Los Angeles Police Department took no extra precautions to secure the party venue, no steps to investigate, discipline, or prosecute those officers involved with Death Row Records or an affiliated street gang.

39.   Based on information and knowledge in the possession of the Los Angeles Police Department, Defendant Perez, Defendant Durden, and former Defendant David Mack and certain unknown persons conspired to murder and murdered Christopher G. L. Wallace.

40.   The Los Angeles Police Department's conscious concealment of facts and information relating to the conspiracy to murder and murder of Christopher G. L. Wallace has deprived the Plaintiffs of additional information relating to culpability or

FIRSTAMENDED COMPLAINT

nonculpability of Defendant Perez, Defendant Durden and former Defendant Mack as well as the involvement and culpability of unknown persons who may be culpable in the conspiracy to murder Christopher G. L. Wallace.

41.    The facts giving rise to claims that Mack participated in the conspiracy to murder and murder of Christopher Wallace include, without limitation, the following:

A.    Plaintiffs incorporate by this reference as though set forth fully herein the facts set forth in paragraphs 28 through 40 above.

B.    At all times pertinent hereto, Mack was an officer employed with the LAPD.

C.    At all times pertinent hereto, Mack was a close friend, associate, and former police partner of Perez, also an officer employed with the Los Angeles Police Department.

D.    At all times pertinent hereto, Mack was a member of the Bloods street gang, a violent street gang associated with Death Row Records. Mack was observed by other LAPD officers dressed in the mode and style of attire worn by members of the Bloods street gang. Mack made admissions relating to the allegations of this paragraph. The Los Angeles Police Department knew or should have known Mack was involved with this gang. Membership in this gang was in conflict with his duties as a police officer.

E.    On or about November 8, 1997, two days after the Mack bank robbery, Perez and Martin drove to Las Vegas, Nevada with Mack. While in Las Vegas, Mack was photographed with Perez and Martin wearing red clothing associated with the Bloods street gang.

F.    At all times pertinent hereto, former Defendant Mack, was associating socially with and was working as a covert agent for Knight,

and Death Row Records. Mack was witnessed by other LAPD officers to be present at Death Row locations and functions.

G.     In March, 1997, Mack had requested another LAPD officer work security for the girlfriend of Knight.

H.     At the time of Mack's association with Knight and Death Row Records, Knight and Death Row were being investigated for multiple crimes of violence. Knight, is a convicted felon who is a member of the bloods street gang. The Los Angeles Police Department knew or should have known Mack was involved with Death Row Records and Knight. Association with Knight and Death Row was in conflict with Mack's duties as a police officer.

I.     Mack had life-sized posters of Tupac Shakur in his garage. Los Angeles Police Department reports call it a "shrine."

J.     Mack was the registered owner of a Black 95 Chevy Impala SS, the same type of vehicle used in the murder.

K.     A witness identified Mack as having been present at the Petersen Automotive Museum party on the night of the murder.

L.     Mack made admissions relating to the allegations of this paragraph and its subparts.

M.     Defendant Perez, in confessing his role in the murder of Wallace, stated that Mack was present at the Petersen Automotive museum on the night of the murder, and he and Mack jointly coordinated the murder of Christopher Wallace.

N.     At the time of this joint action, Defendant Perez was on duty, in uniform, and acting under authority or the pretense of authority.

O.     Another, in confessing his role in the murder inculpated David Mack.

FIRSTAMENDED COMPLAINT

P.     Shortly after the murder of Christopher Wallace, a person placed a telephone call to the decedent's mother, Voletta Wallace and stated that a person identified as "D. Mack" was involved in the murder of Christopher Wallace. Voletta Wallace spoke with the Los Angeles Police Department, gave them the information she had received from the anonymous caller, and requested they investigate. Voletta Wallace was told by the Los Angeles Police Department that there were over 500 "D. Mack's" in the phone directory. No other follow up on this clue was made by the Los Angeles Police Department. Voletta Wallace did not learn that there was a Los Angeles Police officer named "D. Mack" until reading the June 7, 2001, article in Rolling Stone Magazine.

Q.     The first person to visit Mack in jail after the bank robbery was Amir Muhammad. Amir Muhammad was identified as being present at the Petersen Automotive Museum on the night of the murder, in the vicinity of the parking garage.

42.     The facts of this murder relating to Defendant Perez include, without limitation, the following:

A.     Plaintiffs incorporate by this reference as though set forth fully herein the facts set forth in paragraphs above.

B.     At all times pertinent hereto, Perez was an officer employed with the LAPD.

C.     At all times pertinent hereto, Perez was a close friend, associate, and former police partner of Mack, also an officer employed with the Los Angeles Police Department.

D.     It was well known to the Los Angeles Police Department that Defendant Perez was closely associated with Officers Mack and Gaines. The Los Angeles Police Department knew that Gaines, Perez and Mack were conducting coordinated efforts involving serious criminal

FIRSTAMENDED COMPLAINT

conduct.   After LAPD Officer Frank Lyga killed Gaines, Perez stole cocaine that had previously been booked into evidence by Frank Lyga. Perez had access to numerous items of Police property, including police badges, keys to police vehicles, guns, flashlights, scanners, and other equipment provided to Perez by the LAPD.   Substantial quantities of cocaine are still missing from the cocaine stolen by Perez.

E.      At all times pertinent hereto, Perez was a member of the Bloods street gang, a violent street gang associated with Death Row Records.  Perez was observed by other LAPD officers dressed in the mode and style of attire worn by members of the Bloods street gang.  The Los Angeles Police Department knew or should have known Perez was involved with this gang.  Membership in this gang was in conflict with his duties as a police officer.

F.      On or about November 8, 1997, two days after the Mack bank robbery, Perez and Martin drove to Las Vegas, Nevada with Mack. While in Las Vegas, Mack was photographed with Perez and Martin wearing red clothing associated with the Bloods street gang.

G.      At all times pertinent hereto, Perez was associating socially with and was working as a covert agent for Knight, and Death Row Records.  Perez was witnessed by other LAPD officers to be present at Death Row locations and functions.

H.      At the time of Perez's association with Knight and Death Row Records, Knight and Death Row were being investigated for multiple crimes of violence. Knight, is a convicted felon who is a member of the bloods street gang.  The Los Angeles Police Department knew or should have known Perez was involved with Death Row Records and its owner Knight.  Association with Knight and Death Row was in conflict with Perez's duties as a police officer.

I.     Defendant Perez, confessed his role and that of others in the murder of Christopher Wallace.

J.     At the time of this joint action, Defendant Perez was on duty, in uniform, and acting within the course and scope of his employment with the LAPD and/or under authority or the pretense of authority.

K.     It was well known to the Los Angeles Police Department that Defendant Perez had access to numerous stolen and confiscated firearms, from which Perez had removed the serial numbers and other identifying information.  It was well known to the LAPD that in October of 2006, Perez had utilized such a firearm to frame an innocent man for attempted murder of a police officer.

L.     After the shooting, a witness at the scene of the crime stated he looked for shell casings with an officer Perez.

43.     The facts of this murder relating to Defendant Durden include, without limitation, the following:

A.     Plaintiffs incorporate by this reference as though set forth fully herein the facts set forth in paragraphs above.

B.     At all times pertinent hereto, Durden was an officer employed with the LAPD.

C.     At all times pertinent hereto, Durden was a close friend, associate, and police partner of Perez, also an officer employed with the Los Angeles Police Department.

D.     Durden was witnessed by another LAPD officer to be present at the Death Row studio on at least one occasion.

E.     Defendant Perez, in confessing his role in the murder of Wallace.

23

FIRST AMENDED COMPLAINT

F.     At the time of this joint action, Defendant Perez was on duty, in uniform, and acting under authority or the pretense of authority.

G.     At the time of the murder, Defendant Durden was Perez's on duty police partner and was with Perez at all times pertinent hereto on the night of the murder, including during the acts to which Perez has confessed.

44.    The actions of the Defendants Perez, Durden, former Defendant Mack and certain unknown persons were committed jointly under color of California State Law and subjected the Plaintiffs named herein to deprivation of their rights under the United States Constitution. The actions of the Defendants, as described herein, have damaged the Plaintiffs as hereinafter stated and they should be allowed to recover their damages as provided in 42 U.S.C. §1983 and 1985.

45.    The majority of the facts demonstrating the actions of the Defendants were acting under color of state law are in the possession of the Defendants stated herein and have been intentionally and fraudulently concealed from the Plaintiffs in an attempt to frustrate or prevent the Plaintiffs from fully discovering their causes of actions. The information discovered by the Plaintiffs to date is as follows:

A.     Los Angeles Police Department policy provides that LA police officers are always clothed with official authority to prevent crimes occurring in their presence.  Specifically, off-duty officers have peace officer authority as to any public offense committed in his presence to which there is an immediate danger to person or property.  Off duty officers are to give first consideration in ensuring the appropriate action be taken by the responsible law enforcement agency. Such officers should then act only after consideration of "their possible liability and that of the City of LA. " At all times pertinent to the murder of Christopher G. L. Wallace, Defendant Perez, Defendant Durden, and former Defendant

Mack were clothed with "peace officer authority" and had a duty to prevent or report crimes occurring in his presence.

B.    Los Angeles Police Department policy provides that an employee engaged in outside employment shall conduct himself in the same manner as if on duty with particular emphasis on attention to duty and prevention of violations by his employer. Defendant Perez, Defendant Durden, and former Defendant Mack had a duty to prevent or report crimes occurring in their presence.

C.    Los Angeles Police Department Policy provides that an officer, while engaged in outside employment, shall take proper action on any offense that would normally require police attention. Crimes relating to the Murder of Christopher G. L. Wallace are the type of crimes that would normally require police attention.

D.    A concealed firearm carried by an off-duty officer shall be limited to those approved by the department.

E.    As stated previously herein, the Los Angeles Police Department knew or reasonably should have known its officers provided security for street gangs and other criminal organizations during various criminal activities.   According to Los Angeles Police Department documents, Los Angeles Police Officers accompanied gang members during drug deals and acted as lookouts and advisors.   The officers monitored police frequencies, assisted in choosing locations for drug transactions, and gave information on police tactics.

F.    Upon information and belief, Defendant Perez, Defendant Durden, and former Defendant Mack used Los Angeles Police Department radio communication equipment to facilitate the murder and/or escape from the murder of Christopher G. L. Wallace. As an on duty uniformed officer, Defendant Perez, and Defendant Durden, would

have been in possession of Los Angeles Police Department radio communication equipment on the night of the murder. Defendant Perez and former Defendant Mack both had access to and possession of stolen Los Angeles Police Department radio communication equipment. Use of Los Angeles Police Department radio equipment is necessary for employment as a Los Angeles Police Officer and requires Los Angeles Police Department equipment and training. The Los Angeles Police Department's radio communication equipment has unique characteristics and is not available to the general public. Only officers are allowed to check out and use Los Angeles Police Department radio communications equipment. Each radio has a unique Los Angeles Police Department serial number. This serial number is required to broadcast or to receive certain incoming communications from officers in the immediate vicinity. In order to gain access to communications equipment with the proper serial numbers, one must either show Los Angeles Police Department identification, be dressed in the uniform of the Los Angeles Police Department or be otherwise recognized as a Los Angeles police officer. Access to police radio serial numbers required a pretense of performing official duties. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000).

G.    Los Angeles police radio equipment is kept in a locked area, separate from the public to which only officers have access. In order to gain access to the location in which police radio equipment is kept, one must either show Los Angeles Police Department identification, be dressed in the uniform of the Los Angeles Police Department or be otherwise recognized as a Los Angeles police officer. Access to police radio and communications equipment required a

pretense of performing official duties. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000).

H.   By information and belief, Defendant Perez, Defendant Durden, and former Defendant Mack used their knowledge of, and access to, Los Angeles Police Department tactical frequencies to facilitate the murder and escape from the murder of Christopher G. L. Wallace. Use of Los Angeles Police Department tactical frequencies is necessary to employment as a Los Angeles police officer and requires Los Angeles Police department equipment and training.   The Los Angeles Police Department uses various tactical frequencies in undertaking law enforcement activities.   Knowledge regarding the tactical channels used during law enforcement activities is given only to law enforcement officers and is not available to the general public. In order to gain access to Los Angeles Police Department tactical frequencies, one must either show Los Angeles Police Department identification, be dressed in the uniform of the Los Angeles police department or be otherwise recognized as a Los Angeles police officer. Access to police tactical frequencies required a pretense of performing official duties. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000).

I.   By information and belief, Defendant Perez, Defendant Durden, and former Defendant Mack used their knowledge of, and access to, Los Angeles Police Department coding to facilitate the murder of Christopher G. L. Wallace.   Use of Los Angeles Police Department coding is necessary to employment as a Los Angeles police officer and requires Los Angeles Police Department equipment and training.   The Los Angeles Police Department uses various coding in undertaking law enforcement activities.   Knowledge regarding the

FIRSTAMENDED COMPLAINT

coding used during law enforcement activities is given only to law enforcement officers and is not available to the general public.  In order to gain access to Los Angeles Police Department coding, one must either show Los Angeles Police Department identification, be dressed in the uniform of the Los Angeles Police Department or be otherwise recognized as a Los Angeles police officer.  Access to police coding required a pretense of performing official duties. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000).

      J.     By information and belief, Defendant Perez, Defendant Durden, and former Defendant Mack used their knowledge of, and access to, Los Angeles Police Department officer assignment to facilitate the murder of Christopher G. L. Wallace.  Use of Los Angeles Police Department assignment structure is necessary to employment as a Los Angeles police officer and requires Los Angeles Police department involvement and access to information.  The Los Angeles Police Department uses a formal assignment structure in undertaking law enforcement activities.  This assignment structure dictates where officers will be within the city of Los Angeles at a given time, and how many officers will be assigned to a special event.  Knowledge regarding assignment structure to be used during a given event such as that which occurred at the Petersen automotive museum on the night of the murder of Christopher G.L. Wallace, is given only to law enforcement officers and is not available to the general public.  In order to gain access to Los Angeles Police Department assignment structure, one must either show Los Angeles Police Department identification, be dressed in the uniform of the Los Angeles Police Department or be otherwise recognized as a Los Angeles police officer.  Access to police assignments on the night of the Murder of Christopher G.L. Wallace

FIRSTAMENDED COMPLAINT

required a pretense of performing official duties. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000).

K.     By information and belief, Defendant Perez, Defendant Durden, and former Defendant Mack used their knowledge of, and access to, Los Angeles Police Department surveillance to facilitate the murder of Christopher G. L. Wallace.  Use of Los Angeles Police Department surveillance information is necessary to employment as a Los Angeles police officer and requires Los Angeles Police Department involvement and access to information.   The Los Angeles Police Department uses surveillance in undertaking law enforcement activities.  On the days leading to his murder, Christopher G.L. Wallace was under surveillance by the Las Angeles Police Department. Knowledge gained by police surveillance, is given only to law enforcement officers and is not available to the general public.  In order to gain access to Los Angeles Police Department surveillance information, one must either show Los Angeles Police Department identification, be dressed in the uniform of the Los Angeles Police Department or be otherwise recognized as a Los Angeles police officer. Access to police surveillance information relating to Christopher G.L. Wallace, including information regarding the route and time of his leaving the Petersen Automotive Museum and the composition of his private security force required a pretense of performing official duties. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000).

L.     Defendant Perez's, Defendant Durden's, and former Defendant Mack's *modus operandi* for committing crimes required access to and knowledge of police communications equipment and police tactics. During the bank robbery committed by Mack, witnesses recalled hearing police radio traffic coming from suspects in the bank getaway. Mack told

his accomplice in the bank robbery he had police radios and would know the position and timing of police response. The power and authority of Defendant Perez, Defendant Durden, and former Defendant Mack's positions as Los Angeles Police Officers allowed them to know the position of law enforcement personnel on March 9, 1997, the night of the murder of Christopher G. L. Wallace. See *McDade v. West,* 223 F.3d 1135, 1140 (9th Cir. 2000);

M.   Mack had access to police communications on both the night of Christopher G. L. Wallace's murder and the date of the bank robbery. Police communication equipment was found in the search of his home.

N.   The murder of Christopher G. L. Wallace involved precision timing and occurred in front of numerous police officers and other witnesses. The manner in which the crime was committed suggests a high degree of sophistication, access to police communications and knowledge of police tactics, all of which Defendant Mack possessed as the result of his position as a Los Angeles police officer;

O.   Former police officers were used by Death Row Records to avoid the need to obtain gun permits.

P.   The Los Angeles Police Department policy and procedures manual demonstrates a clear intent to govern the off duty conduct by police officers.

Q.   Defendant Perez and Defendant Durden were on duty and in uniform on the night of, and at the place of, the Wallace murder. All actions taken by Perez and Durden were taken under the color of their authority as Los Angeles Police officers.

R.   At all times during the conspiracy to murder and murder of Christopher Wallace, Defendants former Defendant Mack, and other

unknown persons was working jointly with Defendant Perez and Defendant Durden, who were acting under color of law.

S.   Mack attended a police officer continuing education training program in robbery investigation before the bank robbery, and attended a police officer continuing education training program in homicide investigation before the murder (this information was previously concealed from Plaintiffs.)

T.   It was well known to the Los Angeles Police Department that Defendant Mack was closely associated with Officers Perez and Gaines. The Los Angeles Police Department knew that Gaines, Perez and Mack were conducting coordinated efforts involving serious criminal conduct. Mack had access to numerous items of Police property, including police scanners. Approximately $700,000.00 is still missing from Mack's bank robbery.

U.   Perez had access to and possessed numerous items of LAPD police equipment, including police radios, multiple official LAPD police badges, keys to multiple marked and unmarked LAPD police vehicles, and other items. Perez also had access to and/or possession of numerous firearms recovered by Perez and/or his partners during their official police activities which were never legally registered to Perez and which were never properly documented by the LAPD.

46.   The actions of the Defendants, as above described, far exceeded the authority given them by law. The Defendants' training was inadequate and lacking as evidenced by their actions and as will be shown at the time of trial.

47.   The Defendants acted in consort and conspired to deprive the public and the Plaintiffs of protected rights.

48.   The acts of the officers were done knowingly and were reckless and conscious violations of the rights of the Plaintiffs named herein.

FIRSTAMENDED COMPLAINT

49.    On or about March 1, 2000, in a public report regarding the Board of Inquiry into the Rampart Area corruption incident, the Los Angeles Police Department acknowledged itself as an organization that provided Los Angeles police officers opportunities to violate the civil rights of citizens of the United States. The Los Angeles Police Department particularly acknowledged a failure to carefully review reports, a failure to examine events closely to identify patterns, and a failure to provide effective oversight and auditing, all of which created an opportunity for members of the Los Angeles Police Department to violate the civil rights of United States citizens. These aforementioned admitted failures were a cause of the injuries, damages, and losses suffered by the Plaintiffs.

50.    There have been numerous cases filed against the City of Los Angeles relating to corruption and civil rights violations. These cases are generically referred to as "The Rampart" cases. These cases show a pattern or practice of civil rights violations so ingrained as to constitute a policy of the Los Angeles Police Department. These cases demonstrate a policy, custom, and practice in respect to the failure on the part of the Los Angeles Police Department to adequately train and supervise. Failure to train, as demonstrated by the Rampart cases, suggests a level of a deliberate indifference of the rights of persons. As a result of repeated civil rights abuses, the Los Angeles Police Department is now operating under a federal consent decree in respect to their law enforcement activities and is under federal supervision.

51.    Prior to April 2002, and continuing thereafter, Defendants engaged in a conscious and deliberate concealment of officer involvement in the murder of Christopher Wallace.

### III.  FIRST CLAIM FOR RELIEF
### DEPRIVATION OF FAMILIAL COMPANIONSHIP AND SOCIETY
### FOURTEENTH AMENDMENT, 42 U.S.C. § 1983

52.    Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

53.    As of March 9, 1997, there existed a clearly recognized Federal right pursuant to the Fourteenth Amendment of the United States Constitution to be free from unwarranted state interference in familial companionship and society.

54.    As of March 9, 1997, federal law clearly recognized that unconstitutional or illegal acts of off-duty police officers occur under color of state law when, given the totality of the circumstances, the conduct of the officers constitutes a misuse of power possessed by virtue of state law and made possible or prompted because the wrongdoer is clothed with the authority of state law.

55.    As of March 9, 1997, federal law clearly recognized that a police officer is acting under color of state law when he purports, or pretends to act under color of state law, even if his goals are private and outside the scope of visibility.

56.    As of March 9, 1997, federal law clearly recognized that a non-state actor is acting under color of state law when he acts as a willful participant in joint action with a state actor acting under color of state law.

57.    The Plaintiff, Christopher Jordan Wallace is, and at all times mentioned herein was, the minor child of the decedent Christopher G. L. Wallace.  The Plaintiff, Christopher Jordan Wallace, had a clearly recognized constitutional interest in familial companionship and society with the decedent, Christopher G. L. Wallace.

58.    The Plaintiff, T'Yanna Dream Wallace is, and at all times mentioned herein was, the minor child of the decedent, Christopher G. L. Wallace.   The Plaintiff, T'Yanna Dream Wallace, had a clearly recognized constitutional interest in familial companionship and society with the decedent, Christopher G. L. Wallace.

59.    By conspiring to commit, and by committing the acts alleged herein, the Defendants Perez, Durden, former Defendant Mack, and others unknown to Plaintiffs, acting jointly under color of law, violated the Plaintiffs' constitutional rights to familial association in conspiring to cause and in causing the death of the decedent, Christopher G. L. Wallace.

60.    The Plaintiffs have suffered injuries, damages and losses as a result of this deprivation of constitutionally protected rights.

## IV.  SECOND CLAIM FOR RELIEF
## CONSPIRACY BY PEREZ, DURDEN AND MACK TO DEPRIVE THE
## PLAINTIFFS OF THEIR FOURTEENTH AMENDMENT RIGHTS;
## 42 U.S.C. §1983, 42 U.S.C. §1985

61.    Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

62.    As of March 9, 1997, it was a clearly recognized federal law, that a citizen of the United States had a right to be free from conspiracies to deprive a citizen of his or her federal civil rights, including rights under the Fourth and Fourteenth Amendments.

63.    Plaintiffs allege that the Defendants Perez, Durden and former Defendant Mack, together with others, conspired to murder the decedent Christopher Wallace, thereby depriving the Plaintiffs of their federally guaranteed rights to familial association with the decedent.  Such conspiratorial agreement and concerted conduct committed thereunder constitutes actionable federal civil rights conspiracy in contravention of 42 U.S.C. § 1983.

64.    The aforementioned Defendants in this claim for relief are conspiratorially liable as co-conspirators based on the following:

A.    Defendants are members of a conspiracy intended to violate the Plaintiffs' Constitutional rights;

B.    Defendants engaged in activities in furtherance of advancing or promoting the conspiracy designed and intended to violate the Plaintiffs' Constitutional rights;

C.    Defendants were members of a conspiracy during the timeframe that fraudulent activities were committed that constitute a violation of the Plaintiffs' Constitutional rights; and

FIRSTAMENDED COMPLAINT

D.     The offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

65.     The conduct of the Defendants, each and every one of them, constituted willful, wanton, and reckless disregard for the rights of the Plaintiffs as secured by Title 42 U.S.C. §1983.

66.     This violation of the Plaintiffs' Fourth and Fourteenth Amendment Rights caused the Plaintiffs injuries, damages and losses.

## V. THIRD CLAIM FOR RELIEF

## THE CONDUCT OF THE LOS ANGELES POLICE DEPARTMENT DEMONSTRATES A LACK OF TRAINING AND SUPERVISION RISING TO THE LEVEL OF DELIBERATE INDIFFERENCE TO THE RIGHTS OF PERSONS IN LOS ANGELES IN VIOLATION OF THE FOURTEENTH AMENDMENT, 42 U.S.C. §1983

67.     Each and every allegation set forth in the preceding paragraphs is incorporated herein by this reference with the same effect as if realleged herein.

68.     On March 9, 1997, there existed a clearly established federal right protecting citizens of the United States from failures of training or supervision of police officers which rise to the level of a deliberate indifference to rights of Citizens in violation of the due process requirements of the Fourteenth Amendment.

69.     Defendant The City of Los Angeles, and the Los Angeles Police Department, a governmental agency created and existing under the Constitution of the State of California, are charged with the responsibility of supervising the operations of their personnel and are obligated to assure that their personnel are adequately trained and supervised so that they may carry out their duties without violating the Constitutional Rights of United States Citizens.

FIRSTAMENDED COMPLAINT

70.    Defendant The City of Los Angeles, and the Los Angeles Police Department, a governmental agency created and existing under the Constitution of the State of California, knew to a moral certainty, that their employees would confront situations wherein police officers may be compromised by organizations involved in criminal conduct.  Such circumstances require close and proper training and supervision by police officials.

71.    Defendant The City of Los Angeles, and the Los Angeles Police Department, a governmental agency created and existing under the Constitution of the State of California, knew to a moral certainty, that their employees would confront situations wherein police officers might be involved in criminal conduct. Such circumstances require close and proper training and supervision by police officials.

72.    Defendant The City of Los Angeles, and the Los Angeles Police Department, a governmental agency created and existing under the Constitution of the State of California knew to a moral certainty, that their employees would confront situations wherein there was a probability that disclosure of information in the possession of investigators would lead to the imposition of liability on the part of the City and/or individual officers, and that in such circumstances there was a risk officers would secret and conceal information.

73.    In matters regarding a police officer engaging in criminal conduct or associating with organizations actively involved in criminal activity, lack of proper supervision and investigation of the officer and his/her activities will frequently cause a deprivation of a citizen's constitutional rights and at all times pertinent hereto, it was foreseeable that said deliberate indifference would cause harm to the decedent Christopher G. L. Wallace.

74.    Defendant The City of Los Angeles', and the Los Angeles Police Department's failure to intervene in its officers known association with organizations involved in criminal activity including Death Row Records and an affiliated street

FIRSTAMENDED COMPLAINT

gang and their knowing failure to prevent officers from using pretense of state employment in such conduct demonstrated a deliberate indifference to the rights of citizens of the United States and gave rise to a reasonably foreseeable violation of the rights of Christopher G. L. Wallace.

75.    Defendant The City of Los Angeles', and the Los Angeles Police Department's failure to intervene in its officers known association with organizations involved in criminal activity including Death Row Records and an affiliated street gang under pretense of state employment was so entrenched or ingrained in the Los Angeles Police Department so as to constitute a policy of the Los Angeles Police Department and the City of Los Angeles.

76.    In matters regarding municipal and individual officer liability, and the secreting and concealment of officer involvement in criminal activity, lack of proper supervision and investigation of the officer and his/her activities will frequently cause a deprivation of a citizen's constitutional rights and at all times pertinent hereto, it was foreseeable that said deliberate indifference would cause harm to the decedent Christopher G. L. Wallace.

77.    Defendant The City of Los Angeles', and the Los Angeles Police Department's failure to ensure proper and full pre-filing and post filing disclosure of information and evidence of officers known association with organizations involved in criminal activity including Death Row Records and an affiliated street gang and their knowing concealment of officers using pretense of state employment in such conduct demonstrated a deliberate indifference to the rights of citizens of the United States and gave rise to a reasonably foreseeable violation of the rights of Christopher G. L. Wallace.

78.    Defendant The City of Los Angeles', and the Los Angeles Police Department's concealment of evidence of officer involvement and failure to disclose its officers known association with organizations involved in criminal activity including Death Row Records and an affiliated street gang under pretense of state

employment was so entrenched or ingrained in the Los Angeles Police Department so as to constitute a policy of the Los Angeles Police Department and the City of Los Angeles.

79.   Despite possessing the knowledge stated herein, Defendant the City of Los Angeles, and the Los Angeles Police Department took no steps to investigate, discipline, or prosecute those officers involved with Death Row Records or its affiliated street gang.

80.   Despite knowing that Christopher G. L. Wallace would be present at the party at the Petersen Automotive Museum and that persons affiliated with Death Row Records and an affiliated street gang, including, and in particular, police officers, posed a risk of danger to persons affiliated with Bad Boy Entertainment and Christopher G. L. Wallace in particular, the Defendant City of Los Angeles, and the Los Angeles Police Department took no steps to increase security or secure the safety of the venue, or to investigate, discipline, or prosecute those officers involved with Death Row Records or an affiliated street gang.

81.   Defendant The City of Los Angeles, and the Los Angeles Police Department purposefully, and intentionally, cultivated an atmosphere whereby officers would not report their own wrongful conduct, would not report other officers' wrongful conduct, and wherein officers would be severely disciplined and retaliated against for reporting the wrongful conduct of other officers.   This atmosphere was so entrenched, or ingrained in Los Angeles Department so as to constitute a policy of the Los Angeles Police Department.   Said policy was a violation of 42 U.S.C. §1983 and the Fourteenth Amendment.

82.   Defendant The City of Los Angeles, and the Los Angeles Police Department purposefully and intentionally retaliated against officers reporting wrongful conduct of other officers in order to stop, or prevent reports of wrongful conduct from being made to Department Personnel.   It was reasonably foreseeable to the Defendants that such a policy would lead to an atmosphere wherein numerous

officers, including Mack, Durden and Perez herein, could engage in wrongful conduct and whereby otherwise good and law abiding officers would not report wrongful conduct of other officers due to fear and retaliation. Under such a circumstance it was reasonably foreseeable that officers, Mack, Durden and Perez in particular would commit crimes, including murder, and in particular, the murder of Christopher G. L. Wallace.

83.   At all times pertinent hereto, the policies and procedures of the Defendant The City of Los Angeles, and the Los Angeles Police Department were not sufficient to prevent substantial and continuing civil rights abuses by its officers.

84.   Each of the aforementioned deprivations of its citizens' constitutional rights demonstrates an objectively unreasonable failure to train or supervise which constitutes a deliberate indifference to the rights of the citizens of the State of California, and the Plaintiffs in particular.

85.   The conduct alleged above is so entrenched or ingrained in Los Angeles Police Department so as to constitute a policy of the Los Angeles Police Department. Said policy was a violation of 42 U.S.C. §1983 and the Fourteenth Amendment.

86.   By information and belief, the murder of Christopher G. L. Wallace was proximately caused by the policy of the Los Angeles Police Department which fostered illegal activity of its officers.

87.   This violation of the Plaintiffs' Fourteenth Amendment Rights caused the Plaintiffs injuries, damages and losses.

## VI. DAMAGES

WHEREFORE, Plaintiffs pray judgment against Defendants individually and collectively as follows:

1.   For general damages according to proof;

2.   For compensatory damages for all Plaintiffs according to proof;

3.    For exemplary damages, as against each police officer, supervisor, and policy maker Defendants in an amount sufficient to deter and make an example of those Defendants;

4.    For consequential damages according to proof;

5.    For those damages to which the Decedent had been entitled had he survived;

6.    For incidental damages according to proof;

7.    For prejudgment interest according to proof;

8.    For costs of suit, including reasonable attorney's fees and expenses of litigation as provided by federal and state laws, including, but not limited to, 42 U.S.C. §1983;

9.    For such further relief as This Honorable Court deems just and proper.

///

///

///

Respectfully submitted this 27th day of May, 2008.  (Re-submitted 6/6/2008)

Chris Brizzolara.
Bradley C. Gage
ATTORNEY FOR PLAINTIFFS

FIRST AMENDED COMPLAINT

**Proof of Service**

I, Tina Lara, declare as follows:

I am over the age of 18 years, and not a party to this action. My business address is 23002 Victory Blvd., Woodland Hills, California 91367, which is located in the county where the mailing described below took place. On **June 6, 2008** I served the foregoing document(s) described as:
**First Amended Complaint**

on all interested parties in this action, by placing a true copy thereof in a sealed envelope addressed as follows:

**Office of the Los Angeles City Attorney**
**Michael L. Claessens, Esq., Senior Assistant City Attorney**
**Civil Liability Division**
**Room 600 City Hall East**
**200 North Main Street**
**Los Angeles, California 90012**

**Vincent J. Marella, Esq.**
**Dorothy Wolpert, Esq.**
**Thomas V. Reichert, Esq.**
**Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg**
**A Professsional Corporation**
**1875 Century Park East, 23rd Floor**
**Los Angeles, California 90067-2561**

_____ BY PERSONAL SERVICE – ( ) I delivered by hand, or ( ) I caused to be delivered by via messenger service, such envelope to the offices of the addressee with delivery time prior to 5:00 p.m. on the date specified above.

_____ BY FACSIMILE TRANSMITTED TO: the above I caused such documents to be transmitted to the offices of the addressee via facsimile machine, on the date specified above. The facsimile machine I used was in compliance with Rule 2003(3) and the transmission was reported as complete without error. Pursuant to Rule 2008(e), I caused a copy of the transmission report to be properly issued by the transmitting facsimile machine.

__X__ BY MAIL – I thereafter caused such envelope to be deposited in the mail at Los Angeles, California, with the first class postage thereon fully prepaid. I am readily familiar with the business practice for collection and processing of correspondence for mailing. Under that practice, it is deposited with the United States Postal Service on that same day, at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one (1) day after the date of deposit for mailing in affidavit.

1

2

     I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made.

3

     Executed on **June 6, 2008**, at Woodland Hills, California.

4

5

Tina Lara

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28